# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANTOINETTE BLACK ex rel. J.T.,
a minor,

   Plaintiff,

   v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

   Defendant.

No. 14 C 6018

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Antoinette Black filed this action on behalf of her minor daughter, J.T., seeking reversal of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 *et seq*; 42 U.S.C. § 1382c(a)(3). The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff has filed a request to reverse the Administrative Law Judge's (ALJ) decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 976-77 (N.D. Ill.

2001).[1] A child qualifies as disabled and therefore may be eligible for SSI if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and the impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(C)(i); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). To determine whether a child under the age of 18 is disabled within the meaning of the Act, the ALJ applies a three-step evaluation. 20 C.F.R. § 416.924(a). The ALJ must inquire whether: (1) the child is engaged in substantial gainful activity; (2) the child has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"; and (3) the child has an impairment or combination of impairments that meets, medically equals, or functionally equals a listing in the Listings of Impairments contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

To functionally equal the listings, the ALJ must find an "extreme" limitation in one category or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete ac-

---

[1] The regulations governing the determination of disability for Disability Insurance Benefits (DIB) are found at 20 C.F.R. § 404.1501 *et seq*. The standard for determining DIB is virtually identical to that used for SSI. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

tivities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when a child's "impairment(s) interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

## II. PROCEDURAL HISTORY

Antoinette Black filed an application on January 3, 2012, for SSI on behalf of J.T., her minor daughter, alleging she became disabled due to attention deficit hyperactivity disorder and a learning disorder. (R. at 85). The application was denied initially and upon reconsideration. (*Id.* at 85-86, 99-101). Ms. Black and J.T., represented by counsel, appeared and testified at a hearing on January 16, 2013, before an ALJ. (*Id.* at 40-84). The ALJ also heard testimony from Larry Kravitz, a medical expert. (*Id.*). On April 26, 2013, the ALJ issued a decision denying benefits. (*Id.* at 16-34).

Applying the three-step sequential evaluation process, the ALJ found, at step one, that J.T. has not engaged in substantial gainful activity since January 3, 2012, the application date. (R. at 26). At step two, the ALJ found that J.T. had the following severe impairments: learning disorder and attention deficit hyperactivity disorder. (*Id.*). At step three, the ALJ determined that J.T. does not have an impairment or combination of impairments that meets, medically equals or functionally equals the severity of one of the listed impairments enumerated in the regulations. (*Id.* at 22-23). The ALJ concluded that J.T. has not been disabled, as defined in the Act, since January 3, 2012. (*Id.* at 34).

The Appeals Council denied Plaintiff's request for review on July 2, 2014. (*Id.* at 1-3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of

the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

J.T. was born on February 15, 2004, and was seven years old at the time of her application. (R. at 172-80). J.T.'s behavioral and academic issues were first documented in kindergarten, during the 2009-2010 school year. (*Id.* at 204). Progress reports indicate that J.T. was an energetic child with a nice personality; however, she lacked self-control and did not remain focused on tasks. (*Id.* at 204-05). In March 2011, J.T. was identified as an "at risk student." (*Id.* at 203). She was earning

grades of "D" or "F" in mathematics, science, social studies, and literacy – including phonics, fluency, comprehension, and writing. (*Id.*). J.T. was also having problems at home. (*Id.* at 342). In August 2011, J.T.'s parents took her to a psychological evaluation to assess her cognitive and emotional functioning. (*Id.*). She was examined by psychologist, Darrell Snyder, Ph.D. (*Id.* at 344). J.T.'s parents reported that J.T. was always "busy" since the age of three, and that she had behavioral problems at day care, school, summer camp, and at home. (*Id.*). They also reported that she usually demonstrated poor concentration, impulsivity, defiance, and tantrums. (*Id.* at 342). During the examination, one parent accompanied her to the washroom, as they feared what she might do alone, and they also reported that J.T. was not fully capable in hygiene. (*Id.*). Dr. Snyder indicated that there were no indications of attention deficit disorder (ADD) or attention deficit hyperactivity disorder (ADHD)[2] in session, though perhaps J.T. was attentive because of the constant new materials and questions. (*Id.* at 343). Testing revealed that she had a full scale intelligence quotient (IQ) of 73,[3] which is in the borderline range of intelligence, and that her working memory was poor. (*Id.*). Dr. Snyder opined that J.T.'s IQ and potential to

---

[2] Attention-deficit/hyperactivity disorder, is "a childhood mental disorder characterized by inattention (such as distractibility, forgetfulness, not finishing tasks, and not appearing to listen), by hyperactivity and impulsivity (such as fidgeting and squirming, difficulty in remaining seated, excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn, interrupting others, and excessive talking) or by both types of behavior. The disorder is subtyped as predominantly hyperactive-impulsive type, predominantly inattentive type, or combined type, depending on the criteria met. Behavior must interfere with academic, social, or work functioning, with impairment existing in at least two settings. Onset is before age seven but it can persist into adulthood." *Dorland's Medical Dictionary* http://www.dorlands.com (last visited May 4, 2016) [hereinafter *Dorland's*].

[3] Intelligence Quotient is "the measure of intelligence obtained by dividing the patient's mental age, as ascertained by the Binet test, by chronological age and multiplying the result by 100." *Dorland's*.

learn were fine but were compromised by lower auditory attention and perhaps emotional features. (*Id.*). Testing administered to J.T.'s parents revealed that J.T. had problems in the areas of communication, daily living skills, and socialization. (*Id.*). J.T.'s parents also indicated that she fails to sustain attention, to listen, and to follow through; she is easily distracted or loses things; and she fidgets, and leaves her seat in school, church, at dinner, or while watching television. (*Id.* at 344). Dr. Snyder felt that ADHD was likely and indicated that he would recommend a trial course of medication to see its effects. (*Id.*).

On November 11, 2011, Barbara Taylor, J.T.'s second grade teacher of two months, completed a NICHQ Vanderbilt Assessment.[4] (R. at 213). Ms. Taylor indicated that J.T. occasionally was angry or resentful, physically cruel to people, fearful, anxious or worried, self-conscious or easily embarrassed, afraid to try new things for fear of making mistakes, and lost things necessary for tasks or activities. She often did not seem to listen when spoken to directly, ran about or climbed excessively in situations in which she was expected to remain seated, had difficulty playing or engaging in leisure activities quietly and waiting in line, blurted out answers before questions had been completed, interrupted or intruded on others, actively defied or refused to comply with adults' requests or rules, bullied, threatened or intimidated others, initiated physical fights, lied to obtain goods for favors or to

---

[4] The NICHQ Vanderbilt Assessment Scales were developed through the Attention Deficit Hyperactivity Disorder (ADHD) Learning Collaborative project. This resource is used by healthcare professionals to help diagnose ADHD in children between the ages of 6 and 12. *National Institute for Children's Health Quality* http://www.nichq.org/childrens-health/adhd/resources/vanderbilt -assessment-scales#sthash.xsXXU3wL.dpuf (last visited May 4, 2016).

avoid obligations, and did not follow through on instructions and failed to finish schoolwork. She very often failed to give attention to details or made careless mistakes in schoolwork, and was easily distracted by stimuli and forgetful in daily activities. She fidgeted with her hands or feet or squirmed in her seat, was "on the go" or often acted as if "driven by a motor," talked excessively, and lost her temper. (*Id.*). Ms. Taylor indicated that J.T. was problematic in all areas of academic performance and classroom behavior. (*Id.* at 214).

On November 30, 2011, J.T.'s parents attended an Individualized Education Program (IEP) conference with J.T.'s teachers, school psychologist, social worker, and district representative. (R. at 218). The IEP conference revealed that, although she was in the second grade, J.T. read at the kindergarten level, and had difficulty blending sounds, decoding skills, and had virtually no reading fluency. (*Id.* at 232). The group determined that J.T. suffered from a learning disability, and developed an IEP for J.T in language arts, mathematics, biological and physical sciences, social sciences, world language, music, and computers, as well as in other areas such as social/emotional, nonacademic, and extracurricular activities. (*Id.* at 221, 225). J.T. was to receive 750 minutes per week of direct special education services in a separate class. (*Id.* at 238).

On February 17, 2012, J.T. was evaluated by developmental and behavioral pediatrician, Karin Vander Ploeg Booth, M.D. (R. at 367-68). Dr. Booth diagnosed J.T.

with ADHD and prescribed her a trial of Methylin.[5] (*Id.* at 367). Dr. Booth also rec-ommended that J.T. attend behavioral therapy with Dr. Snyder. (*Id.*). On March 7, 2012, J.T.'s teacher Rayshawn Peeples and counselor Frances Booth completed a Request for Administrative Information at the request of the Social Security Admin-istration. (*Id.* at 278-87). They concluded that J.T.'s reading level was at the begin-ning stages of a first grade level, and that her math level was at the mid-to-end stages of a first grade level. (*Id.* at 278). They also found that J.T. was easily dis-tracted and at times, was overly emotional when her behavior was corrected. (*Id.* at 279). She also had difficulty with recalling freshly learned information. (*Id.*). Fur-ther, they opined that J.T.'s math skills were getting better, and she made more at-tempts to process math information than she did with reading and phonics. (*Id.*)

On April 10, 2012, a non-examining state agency psychologist, Ellen Rozenfeld, Psy.D., completed a Childhood Disability Evaluation Form. (R. at 369-74). Dr. Ro-zenfeld indicated that J.T. had ADHD, but that her impairment or combination of impairments did not meet or medically equal a listing. (*Id.* at 369). Dr. Rozenfeld also indicated that J.T.'s IQ did not significantly limit her from performing age ap-propriate activities. (*Id.* at 374). State agency consultant, Michael J. Schneider, Ph.D., affirmed those findings. (*Id.* at 395-400). In May 2012, J.T. returned to coun-seling with Dr. Snyder. (*Id.* at 379). Dr. Snyder noted that J.T. still seemed hyper, talked too much, and was impulsive and made poor choices. (*Id.*). Dr. Snyder asked

---

[5] Methylin is a "trademark for preparations of methylphenidate hydrochloride," which is "used in the treatment of attention-deficit/hyperactivity disorder." *Dorland's*.

J.T.'s physician to consider increasing the dosage level of her medication. (*Id.*). Thereafter, Dr. Booth changed J.T.'s medication to Concerta.[6] (*Id.* at 382).

On October 10, 2012, Mark Hayes, J.T.'s third grade teacher, completed a Teacher Questionnaire and a NICHQ Vanderbilt follow-up assessment at the request of the Social Security Administration. (R. at 331-39). Mr. Hayes noted that he had known J.T. for three years and taught her the past two months. (*Id.* at 331). Mr. Hayes indicated that J.T.'s reading, math, and writing levels were all low. (*Id.*). Mr. Hayes also found that in the domain of acquiring and using information, J.T. had very serious problems understanding school and content vocabulary, reading and comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions. (*Id.* at 332). She had serious problems comprehending oral instructions, comprehending and solving math problems, providing organized oral explanations and adequate descriptions, learning new material, and recalling and applying previously learned material. (*Id.*). Mr. Hayes opined that J.T. had difficulties retaining information in both general and special education classes and that her fluency and phonics skills were low. (*Id.*). He further opined that while J.T. put forth effort, it was obvious that some skills were missing. (*Id.*).

A second IEP conference was held in November 2012. (R. at 410-31). J.T.'s reading, math, and concepts and processes scores were in the third percentile, and her general science score was in the fourth percentile, meaning her scores were low. (*Id.*

---

[6] Concerta is a "trademark for preparations of methylphenidate hydrochloride," which is "used in the treatment of attention-deficit/hyperactivity disorder." *Dorland's.*

at 414). It was noted that J.T.'s behavior needed to be monitored because it impacted her ability to perform in class. (*Id.*). J.T. continued to exhibit impulsive behavior and in order to reduce distractions that impacted her learning, it was determined that J.T. needed support to address her behavior. (*Id.*). J.T. was to continue 750 minutes per week of specialized instruction for another year. (*Id.* at 424).

In a subsequent December 2012 evaluation, Mr. Hayes observed that J.T. often did not pay attention to details; made careless mistakes with homework; had difficulty maintaining attention to what tasks needed to be done; was easily distracted by noises or other stimuli; fidgeted with her hands or feet or squirmed in her seat; blurted out answers before questions were completed; and had difficulty waiting her turn. (R. at 434). J.T. often did not listen when spoken to directly, did not follow through when given directions and failed to finish activities, had difficulty organizing tasks and activities, was forgetful in daily activities, talked too much, and interrupted or intruded in others' conversations or activities. (*Id.*). J.T.'s performance in reading, mathematics, written expression, relationships with peers, following directions, and disrupting class were all somewhat of a problem. (*Id.*).

On January 19, 2013, Dr. Snyder completed a Mental Impairment Assessment Form, at the request of the Social Security Administration. (R. at 457-64). Dr. Snyder indicated that he had seen J.T. and her family members about twenty times since August 6, 2011, with the last encounter on January 12, 2013. (*Id.* at 457). Dr. Snyder diagnosed ADHD, with an IQ of 73. (*Id.*). Dr. Snyder also concluded little had changed since his last report to the Administration. (*Id.*). J.T.'s parents report-

ed that J.T. was improving socially, but even though she was in the third grade level her reading was still at the first grade level; other academic areas were low as well. (*Id.*). Dr. Snyder assessed that J.T. had difficulties learning to read and write, doing math, discussing history and science, and applying learned skills to daily living, but that her limitations were less than marked in her ability to acquire and use information. (*Id.* at 459). Dr. Snyder concluded that the wide range achievement test from August 2011 was dated and only a screening measure, and that up-to-date school data would be more specific. (*Id.*). Dr. Snyder opined that J.T. had a marked limitation in the domain of attending and completing tasks; less than marked limitation in the domains of interacting and relating with others, and caring for self; and no limitations in the domains of moving about and manipulating objects, and health and physical well-being. (*Id.* at 461-64). Subsequently, on January 26, 2013, Dr. Snyder reviewed the November 2012 IEP findings that concluded that J.T. was academically at the third percentile. (*Id.* at 459). As a result, Dr. Snyder amended the acquiring and using information domain from "less than marked" to "marked." (*Id.*).

## V. DISCUSSION

### A. Opinion Evidence

Plaintiff argues that the ALJ improperly weighed the opinion evidence because (1) the ALJ erred by failing to weigh Dr. Snyder's opinion pursuant to the checklist of factors set forth in 20 C.F.R. § 416.927(c) and by failing to provide a sound expla-

nation for rejecting the opinion; and (2) the ALJ failed to weigh the opinion provided by J.T's teacher Mr. Hayes. (Pl.'s Mem. at 8-15).

## 1. The ALJ's evaluation of Dr. Snyder's opinion is not based on substantial evidence.

Plaintiff contends that the ALJ improperly rejected the opinion of J.T.'s treating physician, Dr. Snyder. By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a non-treating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

The ALJ's decision to give Dr. Snyder's January 2013 opinion "little weight" is legally insufficient and not supported by substantial evidence. Specifically, the ALJ gave little weight to Dr. Snyder's January 26, 2013 addendum, where he concluded J.T. has a marked limitation in the domain of acquiring and using information. (R. at 26). The ALJ states:

> In the addendum Dr. Snyder changes his opinion to conclude that claimant has a marked limitation in the domain of acquiring and using information. If the psychologist's posthearing revision is given controlling weight, the claimant is disabled. The undersigned does not accord this opinion controlling weight. Dr. Snyder indicated that he changes his opinion regarding the claimant's limitations in the domain of acquiring and using information from less than marked before the hearing, to a marked limitation after the hearing based on the claimant's RIT scores contained in the IEP meeting date 11/30/2012.

(R. at 26).

In rejecting Dr. Snyder's opinion, the ALJ notes that the treatment history with J.T. "appears to be somewhat sporadic in nature"; "it is unclear whether he is a current treating source"; he had not seen J.T. for six months; the November 2012 IEP relied on by Dr. Snyder shows J.T. does not show "an increase in the amount of minutes of special education provided . . . this indicates that the school believes that the amount of special education provided does not need to be increased because of the test scores or claimant's academic progress"; and the addendum was submitted after the administrative hearing. (R. at 27). Rather, the ALJ afforded great weight to the opinions of Drs. Kravitz and Rozenfeld, non-examining physicians who opined that J.T. has less than marked limitations in the domains of acquiring and using information. (R. at 27).

The following factors must be considered to determine the appropriate weight to give a physician's medical opinion: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5); *see also* SSR 96–5p ("In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors" in 20 CFR 416.927(c)). *See Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014) ("Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion."). In assessing the weight to be afforded Dr. Snyder's opinion, both the ALJ and the Commissioner ignore these factors.

First, in rejecting Dr. Snyder's opinion the ALJ questions whether he is a "current treating physician." (R. at 27). However, the ALJ fails to articulate why she doubts his authenticity as a treating physician. She notes that the treatment is "sporadic" and he hadn't seen J.T. for six months. But a review of the record reveals Dr. Snyder saw J.T. and her family members about twenty times between August 6, 2011 and January 12, 2013. (*Id.* at 457). *See, e.g., Eakin v. Astrue*, 432 F. Appx. 607, 612 (7th Cir. 2011) (physician was considered treating physician after seeing claimant on four occasions).

Moreover, the ALJ fails to consider the evidence which Dr. Snyder bases his opinion, including a mental status examination (R. at 343), interviews with the claimant and her family; and testing and the IEPs prepared by J.T.'s school. (R. at 410-31). In rejecting Dr. Snyder's opinion, the ALJ relies on the fact that the school had not increased J.T.'s time in special education. The ALJ concluded that because the IEP for the 2012-2013 school year did not increase the amount of minutes of special education and her grade report showed improvement from Fs to Cs, then J.T. must be progressing. (R. at 27, 29). Therefore, according to the ALJ, the November 2012 IEP could not lead to a change in Dr. Snyder's assessment of J.T.'s domain of acquiring and using information. (R. at 27, 29). The ALJ concludes: "While clearly the claimant is underperforming, her level of performance is not so great as to be 'marked.'"(R. at 27). An ALJ is not permitted to make an independent medical finding. "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d 863, 870 (7th Cir. 2000); *see Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Lastly, the ALJ relies on the fact that Dr. Snyder's addendum was submitted after the administrative hearing. Without any basis in the record, the ALJ concludes that the reason Dr. Snyder changes his assessment from "less than marked" to "marked" in the category of acquiring and using information was because it was "a

sympathetic reevaluation obtained posthearing." (R. at 27). But Plaintiff argues that Dr. Snyder changed his opinion and found that J.T. suffered a marked limitation based on the November 2012 IEP, months before the January 16, 2013 administrative hearing. While the addendum is dated January 26, 2013, the information relied on is from November 2012. The Commissioner rebuts this argument by noting that the ALJ afforded greater weight to Dr. Kravitz, the medical examiner who also reviewed the November 2012 IEP, but came to a different conclusion. (Dkt. 27, Resp. at 6). The ALJ relies on the testifying medical expert Dr. Kravitz's opinion and affords him "great weight" while affording Dr. Snyder "little weight," noting that Dr. Kravitz "had the opportunity to see the claimant in person, review the longitudinal record, testify from a completely neutral and independent position and render an opinion." (R. at 27). But the fact that Dr. Kravitz came to a different conclusion than Dr. Snyder is not a sufficient reason to reject the treating source's opinion. *Gudgel*, 345 F.3d at 470 ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."); *see also Nimmerrichter v. Colvin*, 4 F.Supp.3d 958, 970 (N.D. Ill. 2013) ("the nonexamining medical expert's opinion alone cannot serve as a reason for rejecting the treating [physician's] opinion"). Regardless, a claimant can submit evidence up until the date that an ALJ issues her decision, and the ALJ cannot discount opinion evidence on the basis that it was submitted after the hearing. *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) ("And in fact the submission and consideration of post-

hearing evidence are common in social security disability cases—especially evidence consisting of posthearing affidavits of experienced workers, supervisors, etc., to rebut vocational 'expert' testimony which cannot be anticipated prior to hearing." (internal quotation omitted)).

In sum, the ALJ provides no "good reasons" for discounting the treating physician's opinion. The ALJ failed to build a "logical bridge" between the facts of the case and the outcome. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). Thus, the Court is left without the ability "to trace the path of [the ALJ's] reasoning." *See Scott*, 297 F.3d at 595 (internal citation omitted). On remand, the ALJ shall reevaluate the weight to be afforded Dr. Snyder's opinion. If the ALJ finds "good reasons" for not giving Dr. Snyder's opinion controlling weight, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give Dr. Snyder's opinion.

## 2. The ALJ's evaluation of Mr. Hayes's opinion is not based on substantial evidence.

The SSA uses medical and other evidence to reach conclusions about an individual's impairment(s) to make a disability determination or decision as described in 20 C.F.R. §§ 416.912 and 416.913. SSR 06-3p. In addition to evidence from physicians, the SSA may use evidence from "other sources" to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. 20 C.F.R. § 416.913(d). Teachers are considered "other sources." (*Id.*). Information from

these "other sources" cannot establish the existence of a medically determinable impairment. (*Id*.). Instead, there must be evidence from an "acceptable medical source" for this purpose. (*Id*.). However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. (*Id*.). Opinions from "non-medical sources" who have seen the individual in her professional capacity should be evaluated by using the applicable factors set forth in 20 C.F.R. 416.927(d). (*Id*.). For opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it is appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion. (*Id*.).

While an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Here, while the ALJ summarized Mr. Hayes's opinion and opined that she considered his statements, the ALJ failed to indicate what weight she gave those statements. This is especially troubling considering Mr. Hayes's assessment was contrary to the ALJ's findings, yet consistent with the IEPs, Dr. Booth's opinion, various teacher statements, and Dr. Snyder's opinion. "The ALJ cannot satisfy [her] obligation with a conclusory statement, but must base

the denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Accurso v. Astrue*, No. 10 C 0968, 2011 WL 578849, at *4 (N.D. Ill. Feb. 9, 2011) (citing *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008)).

In this case, Mr. Hayes provided an opinion regarding the severity of J.T.'s academic and behavioral problems in his October 10, 2012 Teacher Questionnaire. (R. 331-39). Mr. Hayes stated that he had known J.T. for three years and taught her for the past two months; J.T. and Mr. Hayes had a teacher/student relationship; Mr. Hayes's expertise is education; and he presented evidence that J.T.'s reading, math, and writing levels and scores were all low. (*Id.* at 331). The ALJ did not consider any of these factors. Further, Mr. Hayes specifically indicated in the acquiring and using information domain that J.T. had very serious problems understanding school and content vocabulary, reading and comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions. (*Id.* at 332). Mr. Hayes also noted difficulties retaining information in both general and special education classes and that her fluency and phonics skills were low. (*Id.*). The ALJ failed to weigh this opinion in assessing the domain of using and acquiring information. On remand, the ALJ shall reevaluate the weight to be afforded this opinion evidence.

## VI. CONCLUSION

Because the Court is remanding on the opinion evidence issues, the Court chooses not to address Plaintiff's argument that the ALJ failed to determine the credibil-

ity of Ms. Black's statements regarding the severity of J.T's behavioral and academic impairments. For the reasons stated above, Plaintiff's request to reverse the ALJ's decision and remand for additional proceedings [19] is **GRANTED**. Defendant's Motion for Summary Judgment [26] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: May 24, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge